JOHN H. GAHAGEN v. GEORGE A. HORMEL & COMPANY.[1]

June 30, 1916.

Nos. 19,720—(115).

**Master and servant — dangerous place of work — questions for jury.**

Plaintiff's intestate, while in defendant's employ as a teamster, was directed to go with his horses and wagon to a certain place in an alley on defendant's premises to do certain work. While he was so engaged, defendant caused a whistle to be sounded, frightening the horses, causing them to run away, and so injuring plaintiff's intestate that he died shortly thereafter. The place where plaintiff's intestate was at work was rendered peculiarly dangerous when the whistle was blown by reason of the unusually startling effects of the sounds at that point, which invariably frightened horses, causing them to attempt to run away. Plaintiff's intestate did not know of these dangers and was not warned thereof. He had never been at this place when the whistle was sounded. *Held*, that the evidence was sufficient to present to the jury the question whether defendant was negligent.

Action in the district court for Mower county by the administrator of the estate of Henry Dykstra, deceased, to recover $7,500 for the death of his intestate while in the employ of defendant. The case was tried before Quinn, J., who when plaintiff rested granted defendant's motion to dismiss the action. From an order denying his motion for a new trial, plaintiff appealed. Reversed and new trial granted.

*Sasse & French* and *L. T. Shangle,* for appellant.

*Watson & Abernethy,* for respondent.

SCHALLER, J.

Plaintiff's intestate, Henry Dykstra, was a teamster in the employ of defendant corporation at its packing plant at Austin, Minnesota. He was injured at the packing plant May 1, 1913, and died on the same day.

1Reported in 158 N. W. 618.

Note.—As to master's duty generally to warn servant, see note in 44 L.R.A. 33.

The complaint set up negligence of defendant resulting in the death of Dykstra; the answer admitted injury and death, denied negligence, and set up contributory negligence and assumption of the risk. When plaintiff rested his case, the court, on motion of the defendant, dismissed it. Plaintiff moved for a new trial and appeals from the order denying his motion.

The evidence would warrant a finding by the jury of the following facts:

On May 1, 1913, Henry Dykstra, a man 28 years old, had been in defendant's employ as a teamster for a little more than two months. He was survived by his widow and three minor children, the eldest about eight years old, the youngest about five.

He had been a farmer, was familiar with the care and management of horses, and had broken, trained and driven them. On the day of his death he was driving a team of bays which, about a week before, had been brought to the packing plant for use there.

Defendant's plant consisted of a number of structures, buildings and utilities, covered a large tract of land, all convenient, useful and necessary in the conduct of its business. The buildings, so far as here necessary to describe them, were separated by alleys, used by wagons conveying supplies, merchandise and material to and from different parts of the plant.

One of these alleys, about 28 feet wide, ran east and west between a large three story and basement building on the north, and a one and one-half story building on the south. The south walls of the larger building were about 40 feet above the roof of the other. The building on the south of the alleyway was used for an engine and boiler room. About 15 feet south from the alley and at a height of about eight feet above the roof of the boiler room defendant had installed and for many years maintained and used a large steam whistle.

There was a jog or recess in the south wall of the large building, and on the west side of this recess on the ground floor was a door giving access to a freight elevator used in connection with defendant's business. Two other alleys, one to the east, the other to the west of these buildings, gave access to the one first described. There were buildings on both sides of these north and south alleys, all used by defendant in its business. The

alleys resembled the letter "H," the east and west alley being the horizontal part connecting the two verticals.

The whistle, which was loud and penetrating in its tone, could, under favorable conditions, be heard at points up to 17 miles distant. It had been for many years kept, maintained and used by defendant to notify its employees when to begin and when to quit work. It was regularly sounded at 6 o'clock a. m., at 6:55 a. m., at 7 a. m., at noon, at 12:55 p. m., at 1 p. m. and at 6 p. m.

The sound of the whistle was peculiarly loud, shrill and piercing at and near the recess where the freight elevator was located. Because of the high wall, the recess and the surrounding conditions, the sound waves seemed to concentrate at this particular spot in greatly increased volume and strength, so that "they jarred a person like thunder," "struck the ground," "caused a sensational feeling to go through a person when the sound first strikes," and "the ground vibrates a little." One witness testified that the sound was so loud that he had to put his hands over his ears to shut it out. Horses that happened to be in this alleyway near the elevator when the whistle was sounded invariably took fright and started to run away. Similar conditions did not obtain at any other point in the plant, either in the other alleys or indeed in any other place. Elsewhere the sounds were not nearly so loud and the conditions of sensation, jar, shock and reverberation peculiar to the point at the elevator did not exist in such an appreciable degree. These conditions had existed so long that the defendant might be charged with knowledge thereof.

If the jury believed the evidence they could properly have found that when the whistle was sounded this point near the elevator was an unusually dangerous place for a driver with a team of horses.

Deceased on May 1, 1913, between 4 and 5 o'clock p. m. was directed to do certain work, to get certain scraps and take them to this elevator. He was told that he would have time to do so before quitting. He was last seen about two blocks from the meat market in the city, where he probably got the meat scraps. When next seen, he was unconscious, lying against the cement coping of a vat or tank on the west side of the west alley, a little southerly from a point where the south line of the east and west alley, if continued westerly, would intersect the west line of the west alley. He remained unconscious until his death, which occurred at the hospital

within an hour after he was found. The evidence that a basket of meat scraps was scattered westwardly a distance of eight or ten feet, the racket and noise heard by a witness just after the whistle commenced to sound at 6 o'clock p. m., Dykstra's team and wagon found at a lumber pile about ten or fifteen rods south of where he lay, the wagon tracks leading from the elevator to the point where Dykstra lay, point to the conclusion that Dykstra was at the elevator with his team when the whistle blew; that the team ran away; that in turning south at the west alley he was thrown from the wagon onto the ground and against the coping, receiving the injuries from which he died.

There is no evidence that Dykstra had ever been in the east and west alley when the whistle blew, or that he had been warned of the peculiarly dangerous conditions near the elevator at such times.

No one saw the accident. "The presumption is that deceased was in the exercise of due care." Wheeler v. Tyler, 129 Minn. 206, 152 N. W. 137; Fitzgerald v. Armour & Co. 129 Minn. 81, 151 N. W. 539; Dunnell, Minn. Dig. 1916 Supp. § 2616.

There is nothing in the record which militates against this presumption; neither does the evidence sustain defendant's contention that Dykstra assumed the risk. The conditions in and about the elevator and the fact that the whistle would frighten horses were not known to Dykstra. They were not so obvious that Dykstra, who owed no duty to inspect, could be presumed to know them. It does not appear that he understood or ought to have understood the risks growing out of the abnormal situation. Fitzgerald v. Armour & Co. supra.

He was a man of average intelligence; had worked on a farm; was accustomed to handling horses, and had worked around this plant for several months. There is no evidence that he was familiar with the laws of acoustics, nor is such knowledge to be presumed. The evidence tends to show that Dykstra was instructed to go to this, at times peculiarly dangerous place, without warning of the facts which made it so; and that while there engaged in his duties the whistle sounded; that his horses took fright and ran away, throwing him from the wagon and fatally injuring him.

It is true that defendant had the right to construct its plant according to its own ideas of the necessities and convenience of its business and the

best ways to accomplish the results which it sought, so long as no law was violated. But it is also true that if, in the use of its plant, a dangerous condition arose, not anticipated indeed, but actually existing at certain times, it then became the duty of the defendant to use reasonable care to either guard its servants from injury or warn them of the danger. There is no evidence that defendant did either. Order reversed and new trial granted.